# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    *Ex rel.* Jay Meythaler, | ) ) ) | Case No.<br>Hon. |
|     *Plaintiff,* | ) ) | **FILED *IN CAMERA*** <br>**&** |
| v. | ) ) | **UNDER SEAL** |
| DETROIT MEDICAL CENTER, INC.*,*<br>a Michigan corporation,<br>VANGUARD HEALTH SYSTEMS, INC.,<br>a Delaware corporation,<br>TENET HEALTHCARE CORP.,<br>a Delaware corporation,<br>REHABILITATION INSTITUTE OF<br>MICHIGAN, a Delaware corporation | ) ) ) ) ) ) ) ) | **FALSE CLAIMS ACT**<br><br><br><br><br>**JURY TRIAL DEMANDED** |
|     *Defendants*. | ) ) | |

**PLAINTIFF'S COMPLAINT FOR VIOLATIONS OF THE
FEDERAL FALSE CLAIMS ACT, ANTI-KICKBACK STATUTES,
AND THE STARK LAW**

## INTRODUCTION

1.      Qui Tam Relator, Dr. Jay Meythaler, brings this action on his own behalf and on behalf of the United States of America and the State of Michigan to recover civil damages and penalties under various federal statutes and regulations that govern the practices of healthcare providers in referring patients and in billing for their services.

2.      The illegal conduct alleged in this Complaint involves the provision of services by physicians, nurse practitioners, and physicians' assistants who were associated in some way with Defendant Detroit Medical Center, Inc. ("DMC") and other entities who were in business with DMC.

3.      The DMC controls the largest hospital complex in the City of Detroit, which includes eight hospitals and 1500-1800 doctors within its system.  The DMC also provides a Graduate Medical Education Program, working in conjunction with the Wayne State University Medical School.

4.      Relator's allegations involve illegal arrangements between DMC and others concerning the use and assignment of resident physicians in DMC's Graduate Medical Education ("GME")

programs, as well as illegalities in the billings submitted to the United States government for the medical services provided by those resident physicians.

5.      Relator's allegations also involve illegal arrangements under which physicians who were not practicing at DMC were permitted to employ DMC's nurse practitioners and physicians' assistants in return for the physicians' promises to refer their patients for treatment and care at DMC facilities.

**PARTIES**

6.      Relator Dr. Jay Meythaler, M.D. ("Relator" or "Dr. Meythaler") is a resident of Michigan and a citizen of the United States.  He is a board-certified physical medicine and rehabilitation and is licensed to practice medicine under the laws of Michigan, Alabama, Wyoming, Wisconsin, Montana, Idaho and Washington.  Since 2004, Dr. Meythaler has been chairman of the Wayne State University division of the Physical Medicine and Rehabilitation program at Oakwood Hospital, which is part of the DMC.  He practiced at DMC from 2004 to 2010.

7.     The real parties in interest to the claims set forth in this Complaint are the United States of America and the State of Michigan.

8.     Defendants Detroit Medical Center, Inc. ("DMC") is a Michigan not-for-profit corporation with its principal place of business at 3990 John R. Corporate Offices, Detroit, Michigan 48201.  In the time period most relevant to this Complaint, between January 2004 and December 2013, the President and Chief Executive Officer of DMC was Michael Duggan.  Mr. Duggan is now the Mayor of the City of Detroit.

9.     Defendant Vanguard Health Systems, Inc. ("Vanguard") is a Delaware corporation with its principal place of business at 20 Burton Hills Blvd., Suite 100, Nashville, Tennessee 37215. Vanguard acquired DMC on January 1, 2011.

10.     Defendant Tenet Healthcare Corporation ("Tenet") is a Delaware corporation with its principal place of business at 1445 Ross Avenue, Suite 1400, Dallas, Texas 75202.  Tenet acquired Vanguard, including DMC, in 2013.

4

11.    Defendant Rehabilitation Institute of Michigan ("RIM") is a Michigan not-for-profit corporation with its principal place of business at 261 Mack Avenue, Suite 509, Detroit, Michigan 48201.  RIM is affiliated with DMC and placed many medical billings for reimbursement to the United States government.

## JURISDICTION AND VENUE

12.    This action arises under the laws of the United States to redress violations of the following statutes and their attendant regulations:  the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*; the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); and the Stark Law, 42 U.S.C. § 1395nn.

13.    This Court has subject-matter jurisdiction under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

14.    This Court has personal jurisdiction over all of the Defendants because they have all conducted business in southeastern Michigan at all times relevant to this complaint and therefore have a continuous and systematic presence in this District. In addition, each Defendant regularly performs health care services

for persons entitled to benefits under Medicaid and Medicare, and each Defendant submits claims for payment of those benefits.

15.   Venue lies within this district under 28 U.S.C. § 1391(b) & (c) and 31 U.S.C. § 3732(a) because Defendants transact business within this District and the facts forming the basis of this Complaint occurred within this district.

16.   The facts and circumstances of Defendants' violations of the FCA have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit, investigation, or in the news media.

17.   Relator is the original source of the information upon which this Complaint is based, as that phrase is used in the FCA, and he provided disclosures of the allegations of this Complaint to the United States prior to filing this Complaint.

## APPLICABLE LAW

18.   The wrongful conduct by Defendants implicates numerous provisions of federal law regarding the provision of healthcare services and the manner of billing for those services,

especially to Medicaid and Medicare.  The most relevant provisions are as follows.

## False Claims Act

19.    The FCA imposes liability on any person who knowingly presents or causes a false or fraudulent claim to be presented for payment, or to a false record or statement made to get a false or fraudulent claim paid by the government. 31 U.S.C. §3729(a)(1)&(2).

20.    Under the FCA, no proof of specific intent to defraud is required.  For the purposes of the FCA, "knowing" and "knowingly" mean that a person, with respect to information:

(a)    has actual knowledge of the information;

(b)    acts in deliberate ignorance of the truth or falsity of the information; or

(c)    acts in reckless disregard of the truth or falsity of the information.

31 U.S.C. §3729(b).

21.    The FCA is violated not only by a person who makes a false statement or a false record to get the government to pay a claim, but also by one who engages in a course of conduct that causes the government to pay a false or fraudulent claim for money.

7

## The Anti-Kickback Statute

22.     The Anti-Kickback Statute makes it a crime to knowingly and willfully offer, pay, solicit, or receive any remuneration for the purposes of inducing a person to:

> (a)     refer an individual or a person for the furnishing of any item or service covered under a federal health care program; or
>
> (b)     purchase, lease, order, arrange for, or recommend any good, facility, service, or item covered under a federal health care program.

42 U.S.C. § 1320a-7b(b)(1) & (2).

23.     The term "any remuneration" includes any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. 42 U.S.C. § 1320a-7b(b)(1).

24.     Violations of the Anti-Kickback Statute must be knowing and willful.  42 U.S.C. § 1320a-7b(b)(1).  An act is willful if "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Starks*, 157 F.3d 833, 837-38 (11th Cir. 1998).

25.     The Anti-Kickback Statute has been interpreted to cover

any arrangement where one purpose of the remuneration was to obtain money for the referral of service or to induce further referrals. *United States v. Greber*, 760 F.2d 86 (3rd Cir.), *cert. denied*, 474 U.S. 988 (1985).  Payments made to physicians to induce referrals, even if also intended to compensate for professional services, violate the Anti-Kickback Statute.  *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 2008 U.S. Dist. LEXIS 55432 (D.C. Cir. 2008).

26.    A violation of the Anti-Kickback Statute constitutes a felony punishable by a maximum of $25,000, imprisonment of as many as five years, or both.  Any person convicted under the Anti-Kickback Statute must be excluded from participation in federal health care programs for a period of at least five years.  42 U.S.C. § 1320a-7(a)(1).

27.    In addition, regardless of whether a person has been convicted under the Anti-Kickback Statute, the Secretary of Health and Human Services can make his or her own finding of a violation of the Anti-Kickback Statute and may exclude that person from federal health care programs for a period of time to be determined by the Secretary's discretion.  The Secretary may also impose

administrative sanctions of up to $50,000.  42 U.S.C. § 1320a-7(b)

28.   The Department of Health and Human Services has promulgated "safe harbor" regulations that define practices that are not subject to prosecution or sanctions under the Anti-Kickback Statute.  This "safe harbor" provision covers only those practices that meet all of the specified conditions. *See* 42 C.F.R. § 1001.952.  None of the practices alleged in this Complaint as violating the Anti-Kickback Statute fall within this "safe harbor."

<u>The Stark Law</u>

29.   Section 1877 of the Social Security Act, 42 U.S.C. § 1395nn(a)(1) ("the Stark Law"), prohibits a physician from referring Medicare patients for certain "Designated Health Services" to an entity with which the physician or the physician's immediate family has a "financial relationship."  The Stark Law also creates certain exceptions to this prohibition.

30.   The Stark Law's prohibition applies to both inpatient and outpatient hospital services.

31.   The Stark Law broadly defines "financial relationship" to include any ownership interest, investment interest, or compensation

10

agreement that involves and direct or indirect remuneration between a physician and an entity providing "Designated Health Services."

32.    The exceptions to the prohibitions of the Stark Law pertain to identifying specific types of investments and compensation agreements.

33.    Violations of the Stark Law may subject a physician to exclusion from participation in federal health care programs.  Such violations may also entail various financial penalties, including a civil monetary penalty of $15,000 for each individual violation and an assessment of three times the amount claimed for a particular service in connection with a violation of the Stark Law.  42 U.S.C. § 1395nn(g).

## FACTUAL BACKGROUND

34.    Dr. Meythaler is well-qualified to serve as a Relator in this case.  He earned Juris Doctorate from Southern Methodist University in 1980.  He received his medical degree in 1983 from the University of Wisconsin.  In 1986 he completed his residency at the University of Wisconsin.  From 1986 to1992, served as the first residency director of physical medicine and rehabilitation at

the University of Virginia.  Between 1992 and 1994, he was on

the faculty of the University of Alabama Medical School, first as

an Associate Professor and then as Professor While at the

University of Alabama Medical School, he was director of the

residency program.  Since 2004, he has worked at Oakwood

Hospital, where he has been Director and Chair of Physical

Medicine and Rehabilitation.  During his time at Oakwood

Hospital, he initiated a new residency program associated with

the Wayne State University Medical School.

35.   In addition to his professional credentials and

experience, Dr. Meythaler is familiar with the ways in which

hospitals can violate the FCA and other federal laws that

regulate the provision of and billing for healthcare services.

While working at the University of Alabama, he uncovered

serious violations of the FCA and was the relator in another *qui

tam* action filed in the United States District Court for the

Northern District of Alabama, *United States, ex rel. Jay

Meythaler v. University of Alabama Health Servs. Foundation,

P.C.*, Case No. CV-04-B-0112-S.  That case resulted in a settlement

between the United States and the defendant healthcare providers.

36.    Through his association with DMC, Dr. Meythaler

acquired personal knowledge of many of the violations set forth in this

complaint.

### DMC's History of Fraudulent Billing and Its 2010 Settlement with the Justice Department

37.    DMC and its subsidiaries have admitted extensive

violations of False Claims Act and other federal statutes and

regulations.  In a settlement agreement executed in December 2010

("the 2010 Settlement Agreement"), DMC agreed to pay the federal

government $30 million in return for a release of claims by the federal

government in connection with these violations.

38.    The 2010 Settlement Agreement was related to the sale

of DMC to Vanguard.  Indeed, in anticipation of its acquisition of

DMC, Vanguard participated in the 2010 Settlement Agreement.  This

agreement identified certain specific practices and instances of

wrongdoing for which a release of claims was granted.  Among other

things, this wrongful conduct included DMC's practice of providing

marketing materials for physicians. (2010 Settlement Agreement,

attached as Exhibit 1).  But the 2010 Settlement Agreement also

expressly excluded other wrongful conduct that was not described in the agreement.  The agreement specifically referred to all fraud having to be divulged at the time of signing.  If all the fraud was not divulged, then the U.S. government had the ability to penalize the DMC and Vanguard for any further fraud discovered.

39.    As a matter of fact, the 2010 Settlement Agreement disregarded numerous forms of long-term fraudulent and unlawful conduct at DMC.   In many respects, the fraud to which DMC admitted in 2010 was only the tip of the iceberg.

40.    Ironically, after the 2010 Settlement Agreement, and after the sale of DMC to Vanguard, the Center for Medicaid and Medicare Services ("CMS"), which processes payments to healthcare providers on behalf of HHS, returned $20.8 million to Ron Britt, Comptroller of Oakwood Hospital.  HHS declared the money was awarded as the result of an administrative hearing, but it never gave specific reasons for reimbursing this amount to Oakwood Hospital.

## Fraud in DMC's GME Program

41.    The additional wrongful and fraudulent conduct by Defendants began in 1997 with the GME program for resident

14

physicians that was operated by DMC and Wayne State University.

42.    Resident physicians working for DMC were assigned to a particular hospital in the DMC system, but they often performed services for other hospitals as well as the "base" hospital to which they were assigned.  The method of assigning residents within DMC and billing for their services continued from 1997 to at least 2010.

43.    This method violates 42 CFR § 413.78, which regulates the way in which hospitals can bill Medicaid and Medicare for the services of resident physicians who are part of a GME program.  Specifically, § 413.78 makes it unlawful for one resident physician to perform billable services for two different hospitals.

44.    In early 2009, DMC asked its department chairs, including Dr. Meythaler, to approve a hospital document relating to the cost-accounting for the reimbursement for the services of resident physicians.

45.    In response to DMC's request for approval, Dr. Meythaler informed key officials with DMC and RIM that he would not approve the document because it reflected fraud in the cost-accounting and billing for the services of resident physicians.  Dr. Meythaler asserted this position in 2009 in a conference call that included Michael Pelk of

DMC, Kevin Smith, the Chief Financial Officer of RIM, and William

Restum, President of RIM.  Dr. Meythaler also asked that DMC

and/or RIM obtain a legal opinion regarding whether DMC's practice

of cost-accounting and billing for resident physicians was fraudulent

and in violation of federal law, including § 413.78 and other rules.

46.     In mid-2009, DMC commissioned an external review

committee to evaluate DMC's GME program, including DMC's

practice of cost-accounting and billing for resident physicians.  The

external review committee included Dr, John Melvin of Thomas

Jefferson University and Dr. Michael Lee of the University of North

Carolina Medical School.

47.     The external review committee concluded that DMC

violated federal law in connection with the GME program and that

these violations amounted to between $100 million and $200 million.

<u>Fraud in Referral Arrangements Involving DMC's</u>
<u>Nurse Practitioners and Physicians' Assistants</u>

48.     DMC employs numerous nurse practitioners and

physicians' assistants (collectively, "NP-PAs").

49.     Between 2004 and 2011, seventy of the NP-PAs

employed by DMC were used by doctors who were not employed in

the DMC system.  Such use of NP-PAs occurred in numerous

departments of DMC, including Surgery, Neurosurgery, Pediatrics,

and Internal Medicine.

50.    DMC permitted these doctors to use DMC's NP-PAs in

return for the doctors' promises to use DMC facilities to provide care

to their patients.

51.    Because of this quid pro quo arrangement, DMC was able

to bill Medicaid and Medicare for as much as $70 million in violation

of 42 U.S.C. § 1395nn(a)(1) ("the Stark Law"), which prohibits certain

kinds of self-interested patient referrals.

### Efforts by Dr. M to Report and Prevent
### DMC's Fraudulent Conduct

52.    Over a two-year period beginning in 2009, Dr. Meythaler

provided documents outlining DMC's wrongful and fraudulent conduct

to Agent Patricia Rossiter of the Federal Bureau of Investigation

("FBI"). Agent Rossiter collected the CMS billings as evidence to

support Dr. Meythaler's claims but would not issue a copies to

Relator.

53.    On December 6, 2010, when the sale of DMC to

Vanguard was pending, Dr. Meythaler sent an email to Office of

Inspector General ("OIG") for the Department of Health and Human

Services ("HHS"), outlining his knowledge of GME fraud, HIPPAA

violations, Stark II violations at DMC.  (Email from Jay Meythaler to

OIG, Dec. 6, 2010, attached as Exhibit 2).

54.    In January 2011, Relator met with Tom Spokaeski,

Midwest Director of the OIG for HHS.  During that same month,

Relator met with Dewey Powell, Special Agent from HHS.  These two

HHS officials had documents from CMS evidencing the fraud Relator

was describing.

55.    With the sale to Vanguard, DMC began to announce

some changes in its administrative practices with respect to its

fraudulent conduct.  But, in other respects, the wrongful conduct

continued, along with attempts to cover it up.

56.    On January 1, 2011, one day after the sale of the DMC to

Vanguard, Mary Zuckerman, Chief Operating Officer of the DMC,

held a meeting with all seventy of DMC's NP-PAs.  In that meeting

Ms. Zuckerman informed the NP-PAs that DMC would cease the

practice of them servicing private doctors.

57.    Ms. Zuckerman's statements and the DMC's sudden

change in policy reflected the DMC's longstanding fraudulent

conduct, as well as its own knowledge of that conduct.  In her capacity as COO, Ms. Zuckerman had known for years about the DMC's *quid pro quo* involving its NP-PAs; and she knew that violated the Stark Law.  (*See* Email from Jay Meythaler to Pamela Rossiter, Jan. 11, 2011, attached as Exhibit 3 *)* (summarizing Ms. Zuckerman's statements about violations of the Stark Law in connection with the assignment of NP-PAs).  Even so, she still signed the 2010 Settlement Agreement, which did not cover the fraud involving this *quid pro quo*.

58.    On January 10, 2011, eleven days after the sale of the DMC to Vanguard, at a meeting of the chairs of all of DMC's departments, the Dean of the GME program, Val Parisi, declared that the Wayne State University Medical School would no longer "own" the services of the residents in GME program.

59.    At the same meeting in January 2011, Dr. Bonnie Stanton, Chief of Pediatrics, asked Dean Parisi about the DMC's unlawful practice of assigning NP-PAs to private doctors as a *quid pro quo* for referrals to DMC facilities.  Dean Parisi refused to answer the question.

60.    On March 9, 2011, Dr. Meythaler emailed Special Agent

Powell and identified a long list of improper actions taking place at

DMC, beyond the wrongful conduct identified in the 2010 Settlement

Agreement, including GME fraud, the NP-PA billing scheme, a

possible tax situation, and lobbying issues.  Dr. Meythaler also

informed Special Agent Powell about a specific doctor, Dr. Pano

Papelekas, who conspired with DMC to violate the Stark Law. (Email

from Jay Meythaler to Dewey Powell, Mar. 9, 2011, attached as

Exhibit 4).

61.    On Friday, May 27, 2011, Relator had a telephone

conversation with Miechela Lefkowitz of CMS to discuss the

questions of billing fraud that have arisen in connection with DMC's

GME program.  Three days later, Relator informed executives at

Oakwood Hospital about this conversation with CMS.  (Email from

Jay Meythaler to Robert Plaskey, Michael Geheb, Colleen Sturr, and

Ron Britt, May 30, 2011, attached as Exhibit 5).

62.    In July, 2011, during a conference call among CMS

officials and all of the department chairs from DMC and the GME

program, Dr. Meythaler states his belief that GME fraud had occurred

and was ongoing. In response to Dr. Meythaler's statement, Miechela

Lefkowitz of CMS stated that she knew of fraud at DMC concerning

the GME billing and that "[i]t's not my fault the auditors missed that

(fraud) at the DMC."  Also present during this conference call were

Robert Plaskey, GME Director for Oakwood Hosptial, Ron Britt,

Comptroller for Oakwood Hospital, and Colleen Sturr, Residency

Coordinator.

63.    On July 12, 2011, Dr. Meythaler informed Dr. Thomas

Nasca of the Accreditation Council for Graduate Medical Education

("ACGME") GME fraud happening at DMC.  Dr. Meythaler

encouraged ACGME to take action by investigating this fraud. (Email

from Jay Meythaler to Thomas Nasca, July 12, 2011, attached as

Exhibit 6).


## CAUSES OF ACTION

### Count I – Violation of 42 CFR §§ 413.78

64.    Relator hereby incorporates by reference the allegations

in Paragraphs 1-63 of this Complaint.

65.    As set forth in more detail *infra*, Defendants violated

numerous federal statutes and regulations governing billing for

resident physicians' services through their administration of the GME

program at DMC.

66.    More specifically, Defendants violated 42 CFR §§ 413.78

through their joint practice of billing the services of resident

physicians through more than one hospital.

WHERFORE Relator requests the following relief in accordance

with applicable statutes and regulations, including the FCA:

a.    a civil penalty of up to $11,000.00 for each and every
      violation of the law governing billing for the services of
      resident physicians through GME programs associated
      with Defendants;

b.    treble damages for the United States;

c.    an award to Relator of 25% for any and all damages
      awarded to the United States, if the United States decides
      to intervene, and an award to Relator of 30% of such
      damages awarded to the United States if the United
      States decides not to intervene;

d.    Relator's attorneys' fees, costs, and expenses; and

e.    Such other relief as the Court deems just and appropriate.

<u>Count II – Violation of the Stark Law</u>

67.    Relator hereby incorporates by reference the allegations

in Paragraphs 1-66 of this Complaint.

68.    As set forth in more detail *infra*, Defendants violated the

Stark Law through their practice of assigning the NP-PAs employed

by DMC to private physicians in return for the private physicians'

22

agreement to refer their patients to DMC facilities.

WHERFORE Relator requests the following relief in accordance with applicable statutes and regulations, including the FCA:

a.    a civil penalty of up to $15,000.00 for each and every service and a civil penalty of $100,000.00 for each unlawful arrangement that this Court finds to be an unlawful circumvention scheme;

b.    treble damages for the United States;

c.    an award to Relator of 25% for any and all damages awarded to the United States, if the United States decides to intervene, and an award to Relator of 30% of such damages awarded to the United States if the United States decides not to intervene;

d.    Relator's attorneys' fees, costs, and expenses; and

e.    Such other relief as the Court deems just and appropriate

## Count III – Violation of the Anti-Kickback Statute

69.    Relator hereby incorporates by reference the allegations in Paragraphs 1-68 of this Complaint.

70.    As set forth in more detail *infra*, Defendants violated the Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b), through their practice of assigning the NP-PAs employed by DMC to private physicians in return for the private physicians' agreement to refer their patients to DMC facilities.

WHERFORE Relator requests the following relief in accordance with applicable statutes and regulations, including the FCA:

a.   a civil penalty of up to $50,000.00 for each and every violation of the Anti-Kickback statute;

b.   treble damages for the United States;

c.   an award to Relator of 25% for any and all damages awarded to the United States, if the United States decides to intervene, and an award to Relator of 30% of such damages awarded to the United States if the United States decides not to intervene;

d.   Relator's attorneys' fees, costs, and expenses; and

e.   Such other relief as the Court deems just and appropriate

P.W. MATTHEWS, PLLC

/s/   *Phillip Matthews*

Philip Matthews (P53649)
Attorney for Relator
22422 Edison Street
Dearborn, MI  48124
313-492-0991/ Fax 313-557-0157
pmlaw@wowway.com